## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MARION GOODING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-131-TCK-FHM** |
| | ) | |
| **JOHN KETCHER et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### ORDER

Before the Court are Defendant Scott Walton's ("Walton") Motion to Dismiss Second Amended Complaint (Doc. 58) and Defendant John Ketcher's ("Ketcher") Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 59).[1]

**I.      Background**

The following facts are alleged in Plaintiff's Second Amended Complaint.  On or about July 16, 2009, Plaintiff, as a member of a band called Smunty Voje, performed at the Cherokee Casino and used an American flag as a prop during the performance.  Upon the completion of the performance, Ketcher placed Plaintiff under arrest for allegedly violating Okla. Stat. tit. 21, § 372 ("Section 372").[2]  John and Jane Doe Nos. 1 and 2 assisted Ketcher in seizing Plaintiff by impeding

---

[1]  Cherokee Nation initially joined in Ketcher's Motion to Dismiss.  However, the parties subsequently filed a Joint Stipulation of Dismissal Without Prejudice, wherein "all of Plaintiff's claims . . . against Cherokee Nation and Cherokee Nation Entertainment, LLC [were] dismissed without prejudice to re-filing of the same."  (Joint Stipulation of Dismissal 1.)  The Court will therefore only treat those arguments relating to dismissal of Plaintiff's claims against Ketcher.

[2]  Section 372 provides that "[a]ny person who shall contemptuously or maliciously tear down, burn, trample upon, mutilate, deface, defile, defy, treat with indignity, wantonly destroy, or cast contempt, either by word or act, upon any flag, standard, colors or ensign of the United States of America, shall be guilty of a felony."  Violation of Section 372 results in a $3,000 fine, imprisonment of not more than three (3) years, or both.  *See* Okla. Stat. tit. 21, § 373 ("Section 373").

Plaintiff's path.  Plaintiff alleges that his arrest "was intentionally delayed until Plaintiff and Smunty Voje had completed their performance, as employees of the Cherokee Casino were instructed, via radio transmission and hours before the unlawful arrest was effected, that management and security intended that Plaintiff be arrested after the band was completely finished performing for the night." (*Id.* 6.)  Plaintiff further claims that he was accompanied off the premises "by several friends and family, with whom he intended to remain on the premises on the casino and patronize the games and services of the facility, but was precluded from doing so by the arrest."  (*Id.*)

Pursuant to the arrest, Ketcher placed Plaintiff in handcuffs and led Plaintiff to a police patrol car.  Plaintiff stood next to the car as John and Jane Doe Nos. 1 and 2 made photocopies of Plaintiff's identification and "patrons of the casino passed by and could plainly observe Plaintiff as an arrestee." (*Id.* 7.)  Plaintiff was then transported to the Rogers County Jail by John Doe. No. 3 where he was fingerprinted, photographed, "made to completely undress, and [i]nvasively searched and subjected to unwanted contact" by John and Jane Doe Nos. 4-7.  (*Id.*)  Plaintiff was imprisoned for approximately thirteen (13) hours until he posted a $500.00 bond.  Formal charges were not filed against Plaintiff.

Plaintiff's Second Amended Complaint cites two news articles detailing events subsequent to his arrest and imprisonment.  (*See id.* 8.)  The Second Amended Complaint first cites an article from the Tulsa World, wherein Rogers County Assistant District Attorney Patrick Abitbol ("Abitbol") explained why no formal charges were filed against Plaintiff.  The article quotes Abitbol as stating:

> "[F]ederal and Supreme Courts have upheld that type of action is protected free speech.  It's our job to follow the law. . . . It is not a crime to do things to the U.S. flag that most people don't like."

(*Id.* (citing Susan Hylton, *Cherokee marshal arrests Tulsa musician for allegedly trampling flag*, Tulsa World, July 20, 2009, http://www.tulsaworld.com/news/article.aspx?subjectid=11&articleid =20090720_298_0_CATOOS721079&archive=yes).)  The Second Amended Complaint also cites another news article, wherein, as described by Plaintiff, "Walton publicly voiced his approval of [Ketcher's] actions in arresting and imprisoning [him]." (Second Am. Compl. 8.)  This article states:

> "I was shocked and disturbed by this that somebody would think they could get by with that," said Rogers County Sheriff Scott Walton.

> Rogers County Sheriff Scott Walton says the arresting tribal deputy marshal, who is cross deputized with Rogers County, made the right choice.

> "People in this part of the United States are very proud of the flag and what it stands for and the men and women who have lost their lives to protect that flag.  It's not an object to be stomped on or drug across the floor," said Rogers County Sheriff Scott Walton.

(*Id.* (citing Craig Day, *Flag Dispute Arises From Casino Concert*, The News on 6, July 21, 2009, http://www.newson6.com/Global/story.asp?s=1076452&clinettyp).)

Plaintiff subsequently brought suit against: (1) Ketcher, as "an individual and in his capacity as a marshal for the Cherokee Nation and a deputy sheriff of the Rogers County, Oklahoma Sheriff's Office," (Second Am. Compl. 1); (2) Walton, as "an individual and in his capacity as Sheriff of Rogers County," (*id.*); (3) Cherokee Nation; (4) Cherokee Nation Entertainment, LLC;[3] (5) John and Jane Doe Nos. 1 and 2, employees of Cherokee Nation Entertainment, LLC; (6) John Doe No. 3, a commissioned law enforcement officer acting as a deputy sheriff for the Rogers County, Oklahoma Sheriff's Office; (7) John and Jane Doe Nos. 4-6, jailers at the Rogers County Jail; and (8) Jane Doe No. 7, a nurse working at the Rogers County Jail.  Specifically, Plaintiff seeks (1) a declaratory

---

[3] As previously noted, *see supra* fn. 1, Cherokee Nation and Cherokee Nation Entertainment, LLC have since been dismissed from this lawsuit.

judgment that Sections 372 and 373 are unconstitutional under the First and Fourteenth Amendments to the United States Constitution and further asserts claims for (2) "unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983" (against all Defendants), (*id.* 10); (3) "unconstitutional denial of Plaintiff's use of United States flag as expressive conduct in violation of the First and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983" (against all Defendants), (*id.* 12); (4) "violation of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983 pursuant to Defendants' official policy, practice or custom" (against Cherokee Nation and Walton), (*id.*); (5) "violation of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution under 42 U.S.C. § 1983 pursuant to Defendants' failure to train" (against Cherokee Nation and Walton), (*id.* 14);[4] (6) false imprisonment (against all Defendants); and (7) assault and battery (against Ketcher, Walton, Cherokee Nation, and John and Jane Doe Nos. 3-7).

In addition to a declaration that Sections 372 and 373 are unconstitutional, Plaintiff seeks the following relief: (1) actual damages; (2) punitive damages; (3) a declaration that Defendants violated his constitutional rights by (a) unreasonably seizing him, (b) unreasonably searching him, and (c) unlawfully and unreasonably confining Plaintiff in handcuffs, in a patrol car, and in the Rogers County Jail; (4) an order enjoining Walton from enforcing Sections 372 and 373; (5) an order directing Defendants to expunge from any police records and databases any information about Plaintiff obtained as a result of the events on July 16, 2009; and (6) attorneys' fees.

---

[4] Plaintiff's second, third, fourth, and fifth causes of action will hereinafter be referred to as the "§ 1983 claims."

## II.      Walton's Motion to Dismiss

Walton moves to dismiss Plaintiff's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  Specifically, Walton argues that: (1) Plaintiff's § 1983 claims should be dismissed against him in his individual capacity; (2) Plaintiff's § 1983 claims should be dismissed against him in his official capacity; (3) Plaintiff's false imprisonment and assault and battery claims should be dismissed; and (4) Plaintiff's claim for punitive damages should be dismissed.

### A.      Rule 12(b)(6) Standard

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted.  The inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544)).  In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "'nudge [ ] [his] claims across the line from conceivable to plausible.'"  *Schneider*, 493 F.3d at 1177 (quoting *Twombly*, 127 S. Ct. at 1974).  Thus, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Schneider*, 493 F.3d at 1177.

### B.      Section 1983 Claims Asserted Against Walton in His Individual Capacity

Walton first moves to dismiss the § 1983 claims asserted against him in his individual capacity.  "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009); *see Foote v.*

*Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  "Supervisory status alone does not create § 1983

liability."  *Gallagher*, 587 F.3d at 1069.  Rather, "[a] supervisor is not liable under [§ 1983] unless

an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's

'personal participation, his exercise of control or direction, or his failure to supervise.'"  *Meade v.*

*Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) (quoting *Specht v. Jensen*, 832 F.2d 1516, 1524 (10th

Cir. 1987)).  "A supervisor [may also] be held liable where there is essentially a complete failure

to train, or training that is so reckless or grossly negligent that future misconduct is almost

inevitable."  *Meade*, 841 F.2d at 1528.

In this case, as outlined above, Plaintiff asserts four § 1983 claims against Walton.  (*See*

Second Am. Compl. 10-15 (alleging § 1983 claims for (1) unreasonable search and seizure in

violation of the Fourth and Fourteenth Amendments; (2) unconstitutional denial and suppression of

the right to free speech and expression in violation of the First and Fourteenth Amendments; (3)

violation of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments pursuant to

Defendants' official policy, practice, or custom; and (4) violation of Plaintiff's rights under the First,

Fourth, and Fourteenth Amendments pursuant to Defendants' failure to train).)  At the core of all

claims is Plaintiff's allegation that his use of the flag during the July 16, 2009 performance

constituted protected speech or expression, such that his arrest and imprisonment violated his

constitutional rights.

Walton argues that he was not "personally involved" in Plaintiff's arrest or imprisonment

and therefore cannot be individually liable for the alleged resulting constitutional violations.  (Mot.

to Dismiss 6.)  Although Walton is correct that the Second Amended Complaint does not allege that

Walton was present for Plaintiff's arrest and imprisonment, Plaintiff seeks to impose individual

liability due to Walton's supervisory capacity over the officers carrying out the arrest and imprisonment.  Specifically, Plaintiff argues that the "affirmative link" between Walton and the alleged constitutional deprivations is a complete failure to train the deputy sheriffs as to the unlawfulness of Plaintiff's arrest.  (*See* Second Am. Compl. 14 ("The training policies of [Walton] . . . were not adequate to train [the] deputy sheriffs/marshals to handle the usual and recurring situations with which they must deal, specifically, [Walton] did not properly update [Ketcher] concerning the state of the law as expressed in the United States Supreme Court's decisions in [*Texas v. Johnson*, 491 U.S. 39 (1989) and *United States v. Eichman*, 496 U.S. 310 (1990)].").) Plaintiff further alleges that Ketcher acted pursuant to an "expressly adopted official policy or long-standing practice or custom of [Walton]" in arresting and imprisoning Plaintiff, (Second Am. Compl 13), and that Walton publicly voiced his approval of Ketcher's actions, stating that Ketcher "made the right choice" and that he was "shocked and disturbed" by Plaintiff's behavior, (*id.* 8).

Looking solely at the allegations in Plaintiff's Second Amended Complaint, as the Court must at this stage, the Court finds that Plaintiff's allegations are sufficient to withstand Walton's motion to dismiss.  Plaintiff alleges that he engaged in activity which was constitutionally protected, that Walton failed to train his deputies as to the constitutional nature of such activity, and in fact adopted an unconstitutional policy and/or custom which led to Plaintiff's arrest and imprisonment. Although the record has yet to be developed in this case and the Court therefore makes no finding as to the constitutionality of Section 372, Plaintiff's Second Amended Complaint contains "enough facts to state a claim to relief [under § 1983] that is plausible on its face" based on Walton's alleged failure to properly train his deputies and adoption of an unconstitutional policy and/or custom. *Schneider*, 493 F.3d at 1177; *see also Meade*, 841 F.2d at 1528 (denying motion to dismiss § 1983

claim asserted against sheriff in his individual capacity when plaintiff's complaint alleged that sheriff failed to properly supervise his deputies and was indifferent to plaintiff's constitutional rights); *Chiles v. Okla. Dep't of Corr.*, No. CIV-11-49-RAW, 2011 WL 1871215, at *2 (E.D. Okla. May 16, 2011) (denying motion to dismiss § 1983 claim asserted against defendant in his individual capacity when complaint alleged personal involvement in constitutional violation based on alleged failure to train correctional officers) (noting assessment of such a claim was "more appropriate for a post-discovery motion for summary judgment").

### C.    Section 1983 Claims Asserted Against Walton in His Official Capacity

Walton also moves to dismiss the § 1983 claims asserted against him in his official capacity. "A [section 1983] suit against a municipality and a suit against a municipal official acting in his or official capacity are the same." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998). A municipality, however, will not be held liable under § 1983 solely because its employees inflicted injury. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). To establish municipal liability under § 1983, a plaintiff must show: "(1) the existence of a municipal policy or custom and (2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006). The official policy requirement permits courts to "distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *see Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (explaining that "local governments are responsible only for their own illegal acts, [and] [t]hey are not vicariously liable under § 1983 for their employees' actions").

8

A plaintiff can demonstrate a "municipal policy or custom" through an officially promulgated policy; a custom or persistent practice; a single decision by an official with final decision-making authority; ratification by an official with final decision-making authority of subordinates' decisions; or deliberately indifferent training that results in the violation of plaintiff's federally protected rights. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010); *Smith v. Barber*, 195 F. Supp. 2d 1264, 1271, n.2 (D. Kan. 2002). Walton argues that the § 1983 claims asserted against him in his official capacity should be dismissed because Plaintiff's Second Amended Complaint does not sufficiently state a claim for relief based on (1) inadequate training, (2) the existence of a municipal policy, or (3) an unconstitutional search and seizure at the Rogers County Jail. (*See* Walton's Mot. to Dismiss 8-11.)

### (1)    Inadequate Training

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 131 S.Ct. at 1359. The Supreme Court has recently discussed such a failure to train claim:

> To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983. Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

*Id.* at 1359-60 (internal citations and quotations omitted). Further, although a "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference," *id.* at 1360 (internal quotations and citations omitted), the Supreme Court has suggested that "in a narrow range or circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," *id.* at 1361 (discussing *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)). The single incident exception can be shown if "a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1999) (internal quotations omitted); *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th. Cir. 2002). Further, "[i]n the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Because the Second Amended Complaint does not allege an ongoing pattern of misconduct, but instead focuses solely on the incident involving Plaintiff, Plaintiff must demonstrate that he has sufficiently alleged facts justifying application of the single incident exception.

Walton argues that Plaintiff's § 1983 claim for inadequate training should be dismissed because Walton "has no responsibilities or duties in training or supervising the training of marshals for the Cherokee Nation." (Walton's Mot. to Dismiss 10.) Walton also argues that Plaintiff is unable to meet the stringent standard for an inadequate training claim, as set forth above. The Court does not find dismissal appropriate on either basis. First, Walton's motion is made pursuant to Rule

12(b)(6), so the Court must look only to the allegations of the Second Amended Complaint. Therein, Plaintiff alleges that Walton was "at all times relevant to [Plaintiff's claims], a commissioned law enforcement officer and the duly-elected sheriff and chief policy maker for the Rogers County, Oklahoma Sheriff's Office," (Second Am. Compl. 4), and that Ketcher was "a commissioned law enforcement officer acting as a marshal for the Cherokee Nation *and a deputy sheriff for the Rogers County's Sheriff's Office*," (*id.* 3) (emphasis added).  Plaintiff also alleges that Ketcher was acting as an "employee of Walton" during the events giving rise to his claims.  (*See id.* 12, 13, & 14.)  Thus, although not explicitly stated, the allegations of Plaintiff's Second Amended Complaint are sufficient to demonstrate that, for the purposes of Walton's Motion to Dismiss, Walton was responsible for Ketcher's training and supervision as Sheriff of Rogers County and Ketcher's alleged employer.

Second, the Court disagrees with Walton's contention that the allegations of the Second Amended Complaint are insufficient to support a claim for inadequate training.  Specifically, Plaintiff alleges as follows:

> The training policies of [Walton and Cherokee Nation] were not adequate to train their deputy sheriffs/marshals to handle the usual and recurring situations with which they must deal, specifically Defendants did not properly update [Ketcher] concerning the state of the law as expressed in the United States Supreme Court's decisions of [*Texas v. Johnson*, 491 U.S. 397 (1989) and *United States v. Eichman*, 496 U.S. 310 (1990)].

> Defendants [Walton] and Cherokee Nation were deliberately indifferent to the obvious consequences of their failure to train their police officers/marshals adequately.

> The failure of Defendants [Walton] and Cherokee Nation to provide adequate training caused the deprivation of Plaintiff's rights by [Ketcher], deputy sheriff/marshal, in that Defendants' failure to train is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

11

(Second Am. Compl. 14-15.) Further, as noted above, Plaintiff alleges that Walton is the "chief policy maker for the Rogers County, Oklahoma Sheriff's Office." (*Id.* 4.) The Court finds that these allegations are sufficient to state a plausible claim based on inadequate training for the purposes of surviving Walton's Motion to Dismiss. Given the import of the Supreme Court's decisions regarding flag desecration in *Johnson* and *Eichman*, an alleged failure to train officers as to these cases could plausibly result in "an obvious potential for constitutional violations." *Olsen*, 312 F.3d at 1318; *see also Winsness v. Campbell*, No. 2:04-CV-904 TS, 2006 WL 463529, at *9 (D. Utah Feb. 24, 2006) (noting that right to use flag for expressive purposes was "sufficiently established to put [officer] on notice that enforcing Utah's flag statute, in light of [p]laintiff's expressive intent, would violate the First Amendment of the United States Constitution"); *Koser v. Cnty. of Price*, 834 F. Supp. 305, 309 (W.D. Wisc. 1993) (noting that "[i]n light of [*Johnson*], . . . it was clearly established as a matter of constitutional law that persons using the American flag to express political opinions could not be prosecuted for their actions, even if they added symbols to the flag or burned it publicly") (denying qualified immunity defense on basis that reasonable law enforcement officers in the circumstances of defendants "would have known . . . it was not constitutional for them to arrest plaintiffs for their display of the Plains Indian flag, [because] [a]lthough [*Johnson*] was a fairly recent opinion, it had been issued almost four months earlier and had received extensive media attention").[5] Further, there is support for basing an inadequate training claim on a defendant's

---

[5] *Winsness* and *Koser* discussed *Johnson* and *Eichman* in the context of whether defendant officers were entitled to qualified immunity. That question is not presently before the Court, and the Court offers *Winsness* and *Koser* merely to illustrate the impact of *Johnson* and *Eichman* on the constitutionality of officers' actions with regard to flag desecration.

failure to train officers on relevant case law, as is alleged here. *See Bowen-Soto v. City of Liberal, Kan.*, No. 08-1171-MLB, 2010 WL 4643350, at *4 (D. Kan. Nov. 9, 2010) (denying summary judgment on § 1983 inadequate training claim because court found material question of fact as to whether defendant's training on use of "hog-tie" restraint was adequate when supervisor did not instruct his officers as to a relevant Tenth Circuit case, which held that the "hog-tie" restraint constituted excessive force).   Therefore, based on the allegations contained in the Second Amended Complaint, the Court finds that Plaintiff has stated a plausible claim for relief under § 1983 based on inadequate training.   *See McNeal v. Zobrist*, 365 F. Supp. 2d 1166, 1173-74 (D. Kan. 2005) (denying motion to dismiss § 1983 claim based on inadequate training and noting that "[a] motion to dismiss is not the proper device to determine whether Plaintiff can satisfy the higher standards of proof necessary to hold a municipality liable under § 1983").

### (2)  Municipal Policy

Second, Walton argues the allegations in the Second Amended Complaint are insufficient to demonstrate that Rogers County had a policy or custom that was the moving force behind the alleged violation of Plaintiff's constitutional rights.   In assessing the pleading standard for municipal liability, the Court agrees with the approach recently taken in *Taylor v. RED Development, LLC*, No. 11-2178-JWL, 2011 WL 3880881 (D. Kan. Aug. 31, 2011), wherein the court required more than "boilerplate allegations" of a municipal policy, but did not "deman[d] specific facts that prove the existence of a policy" when a plaintiff would not have access to such information before discovery. *Id.* at *3-4 (citing *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011)).   Applying this approach, the Court finds that the allegations of Plaintiff's Second Amended Complaint are sufficient for the purposes of Walton's Rule 12(b)(6) motion because Plaintiff has

done more than simply allege that Ketcher's conduct conformed to an official policy or practice. Specifically, the Second Amended Complaint provides more context with regard to the policy or custom, as Plaintiff alleges that said policy/custom "encouraged the confinement of Plaintiff" in response to Plaintiff's use of the flag for allegedly expressive purposes. (*See* Second Am. Compl. 16, 17.) *See Taylor*, 2011 WL 3880881, at *4 (denying motion to dismiss based on Rule 12(b)(6) when plaintiffs did "more than simply allege that the individual officers' conduct conformed to official policy or practice," and instead "identified a specific practice to which the officers' conduct allegedly conformed"). The Court therefore denies Walton's Motion to Dismiss to the extent it is based on the contention that Plaintiff has not sufficiently alleged a municipal policy or custom.

### (3)   Search and Seizure

Finally, Walton argues that Plaintiff provides "insubstantial allegations to support his claim that he was subjected to an unconstitutional search and seizure while at the Rogers County Jail." (Walton's Mot. to Dismiss 9.)  Specifically, Walton maintains that "Plaintiff provides no specific details indicating that the search exceeded the bounds of what is considered reasonable in the jail context." (*Id.*)  The Second Amended Complaint makes the following allegations with regard to the search and seizure of Plaintiff:

> Defendants deprived Plaintiff of his civil rights under the Fourth and Fourteenth Amendments to the United States Constitution by unlawfully, intentionally and unreasonably seizing his person for actions that the United States Supreme Court has deemed protected speech or expression, namely, using the United States flag as part of Plaintiff's performance.

> Said seizure began with the arrest of Plaintiff and continued through his confinement in the Rogers County Jail; was done without probable cause, a warrant, or any other proper justification as Plaintiff's actions did not constitute a crime; and was therefore unreasonable under the Fourth and Fourteenth Amendments to the United States Constitution.

14

> Further, pursuant to the above referenced unreasonable and unlawful seizure of Plaintiff's person, Defendants further deprived Plaintiff of his civil rights by subjecting Plaintiff to invasive searches of his person while in the custody of Defendants, first by the arresting officer, [Ketcher], with assistance from casino security personnel . . . and later at the Rogers County Jail by personnel of the Rogers County Sheriff's Office.

> Such searches were performed intentionally and were unreasonable in that they were performed pursuant to an unreasonable and unlawful seizure of Plaintiff, and said searches were conducted without his consent or warrant.

(Second Am. Compl. 11.)  As evident from these allegations, Plaintiff essentially claims that the seizure and search of his person were unconstitutional because the underlying conduct for which he was seized – namely, his use of the United States flag during a stage performance – was legal and did not provide lawful grounds upon which to base his arrest and the subsequent searches of his person.  Based on these allegations, Walton's argument that Plaintiff does not outline the "specific details" of the search is unavailing, as the success or failure of Plaintiff's unconstitutional search and seizure claim does not depend on such details.  Rather, it depends on the lawfulness of the underlying arrest, which, after development of the record, can be determined based on Plaintiff's precise use of the flag during his performance and the ultimate constitutionality of Section 372.

### D.    State Tort Claims[6]

Walton argues Plaintiff's state law claims for false imprisonment and assault and battery should be dismissed pursuant to two exceptions of the Oklahoma Governmental Tort Claims Act ("GTCA"), Okla. Stat. tit. 51, § 151 *et seq.*  The first exception states as follows:

---

[6] Walton's Motion to Dismiss presumes that Plaintiff's state tort claims are asserted against Walton in his official capacity.  (*See* Walton Mot. to Dismiss 12.)  Plaintiff's response brief does not dispute this presumption.

> [t]he state or a political subdivision shall not be liable if a loss or claim results from:
>  . . .
> (4) [a]doption or enforcement of or failure to adopt or enforce a law, whether valid or invalid, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy[.]

Okla. Stat. tit. 51, § 155(4) ("Section 155(4)").  The Supreme Court of Oklahoma has made clear that Section 155(4) does not "provid[e] blanket immunity to political subdivisions for any claim arising from law enforcement[.]"  *Tuffy's Inc. v. The City of Okla. City*, 212 P.3d 1158, 1167 (Okla. 2009).  Rather, "[t]he purpose of [Section 155(4)] is to protect the discretionary acts of law enforcement officers in deciding whether a given situation calls for enforcing a law or not."  *Morales v. The City of Okla. City*, 230 P.3d 869, 876 (Okla. 2010).

Second, the GTCA provides that "[t]he state or a political subdivision shall not be liable if a loss or claim results from: . . . (24) [p]rovision, equipping, operation or maintenance of any prison, jail, or correctional facility."  Okla. Stat. tit. 51, § 155(24) ("Section 155(24)").  The Oklahoma Supreme Court has clarified that Section 155(24)

> protects the state from liability for loss resulting from the actual stock of (provision) or the supplying of (equipping) all that is necessary to the functioning of a penal institution, or the process or manner of conducting (operation) the functions of a penal institution, or the process or series of acts necessary to sustaining (maintenance) the proper conditions of a penal institution.

*Medina v. State*, 871 P.2d 1379, 1382 (Okla. 1993) (holding state and prison officials were immune from suit for the allegedly negligent operational function of dispensing medicine to prisoners).  The Supreme Court of Oklahoma has additionally stated that the plain language of Section 155(24) "includes the myriad of actions involved in the day to day operation of a prison, and that the obvious purpose and intent of [Section 155(24)] is to shield the state from tort liability for loss resulting from functions of officers and employees performed in the operation of a penal institution."  *Redding v.*

16

*State*, 882 P.2d 61, 63 (Okla. 1994) (also noting that the legislative intent of Section 155(24) is "to protect the state from liability for loss resulting from *any and all actions* of officers and employees of a penal institution") (emphasis added).

### (1)     False Imprisonment

In asserting a claim for false imprisonment, Plaintiff alleges that "Defendants caused the unlawful confinement of Plaintiff by and through the unlawful and unreasonable seizure of Plaintiff's person," and that "Plaintiff was conscious of his confinement through Defendants' use of handcuffs and Plaintiff's detention and confinement in a Rogers County patrol car and in the Rogers County Jail[.]" (Second Am. Compl. 15.) Plaintiff further claims that his "confinement was without legal justification in that the seizure of Plaintiff's person and subsequent confinement were done in violation of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution."  (*Id*. 16.)

Based on these allegations, the Court agrees with Walton that Section 155(4) bars Plaintiff's claim for false imprisonment.  The "unlawful confinement" of Plaintiff – through the initial seizure of his person and the subsequent detention and confinement of Plaintiff in the patrol car and jail – was the result of Ketcher's decision to enforce Section 372 by placing Plaintiff under arrest.  Such a decision is within the protection afforded by Section 155(4), as outlined by the Oklahoma Supreme Court.  Specifically, in *Morales,* the Oklahoma Supreme Court stated:

> The purpose of [Section 155(4)] is to protect the discretionary acts of law enforcement officers in deciding whether a given situation calls for enforcing a law or not.  That choice, whichever way it goes, may result in a detriment visited upon either the person with whom the officer is engaged or upon a third person.  It is the exercise of that discretion which is protected by this exemption.  Once an officer makes the decision to enforce a law by making an arrest, he or she must do so in a lawful manner.  If a tort is committed in the process of making an arrest, [Section

155(4)] does not provide immunity from suit to the officer's governmental employer for the resulting damages.

230 P.3d at 876; *see also State ex rel. Dep't of Pub. Safety v. Gurich*, 238 P.3d 1, 4 (Okla. 2010) ("The State and its political subdivisions enjoy immunity for the *choice to* . . . enforce a law[.]") (emphasis added).  Plaintiff's false imprisonment claim does not arise from a tort "committed in the process of making an arrest," which would fall outside the confines of Section 155(4), but rather stems from the "discretionary ac[t] of [Ketcher] in deciding . . . to enforce [Section 372] by making an arrest[.]" *Morales*, 230 P.3d at 876.  Thus, according to *Morales*, the claim falls within the immunity provided by Section 155(4), and Plaintiff is unable to make a plausible claim for false imprisonment.

The Court notes Plaintiff's citation to *Overall v. State ex rel. Department of Public Safety*, 910 P.2d 1087 (Okla. Ct. App. 1995), in response to Walton's Motion to Dismiss, but finds *Overall* distinguishable from the instant matter.  In *Overall*, plaintiffs brought suit against the State of Oklahoma, claiming that they were "falsely arrested and imprisoned by Oklahoma Highway Patrol troopers[.]"  *Id.* at 1089 (internal quotations omitted).  Specifically, plaintiffs were arrested for failing to obey officers' orders when they returned to a race track after, according to the officers, the officers ordered plaintiffs to leave the premises, stay home, and not return to the track.  The State of Oklahoma moved for summary judgment, arguing, *inter alia*, that  it was immune from suit based on Section 155(4).  Plaintiffs argued that Section 155(4) was inapplicable because, despite the officers' contentions, the officers never told them to go home or stay away from the race track.  Plaintiffs therefore contended that their arrest was not based on the enforcement of any law.  The *Overall* court agreed and upheld the denial of the State's motion for summary judgment because

18

plaintiffs' claims were grounded on the allegation that the officers were not enforcing any law when they arrested them.

In contrast, the existence of the underlying law supporting Plaintiff's arrest – namely, Section 372 – is not in dispute in this matter.  Further, *Overall* predates the Oklahoma Supreme Court's discussion of Section 155(4) in *Morales*.  As discussed above, *Morales* indicates that an officer's decision whether to enforce a statute, which is the basis for Plaintiff's false imprisonment claim in this case, is the very situation protected by Section 155(4).  The Court therefore declines to hold Section 155(4) inapplicable based on *Overall* and grants Walton's Motion to Dismiss as to the false imprisonment claim.

### (2)        Assault and Battery

Plaintiff claims he was subjected to harmful and offensive contact when: (1) Ketcher "effected his unlawful and unreasonable seizure and subsequent search of Plaintiff's person"; (2) Ketcher "grabb[ed] Plaintiff, tightly clamping handcuffs onto Plaintiff's wrists (causing red marks and pain), and search[ed] Plaintiff's person"; (3) John Doe No. 3 "placed his hands upon Plaintiff multiple times in the course of his transporting Plaintiff to the Rogers County Jail, specifically, in putting Plaintiff into and extracting Plaintiff from Defendant's patrol car, and when escorting Plaintiff into the jail"; and (4) John and Jane Does Nos. 4, 5, 6, and 7 "plac[ed] their hands on Plaintiff in the course of their invasive handling and searches of Plaintiff pursuant to the booking process at the Rogers County Jail."  (Second Am. Compl. 16-17.)

Walton argues that Plaintiff's assault and battery claim is barred by both Section 155(4) and Section 155(24).  The Court agrees.  First, with regard to the allegedly harmful and offensive contact taking place prior to the booking process at the Rogers County Jail, such contact took place in

conjunction with Plaintiff's arrest, and Plaintiff's allegations do not suggest that the contact exceeded that which normally takes place during an arrest.  In other words, Plaintiff does not allege any facts tending to show, for example, that Ketcher used excessive force or acted improperly in the manner in which he touched Plaintiff during the arrest process.  Therefore, because Plaintiff's arrest, including the contact between Ketcher and Plaintiff that occurred in effectuating the arrest, was the result of Ketcher's decision to enforce Section 372, the Court again finds Section 155(4) applicable. *See supra* Section II.D(1).

Further, with regard to the alleged harmful and offensive contact occurring at the Rogers County Jail, the Court finds that Section 155(24) is applicable.  Plaintiff's Second Amended Complaint does not allege any contact that is outside the bounds of a standard booking process at a detention facility.  Therefore, the Court finds that any contact between the officers and Plaintiff at the Rogers County Jail, including any search of Plaintiff's person, was part of the "operation or maintenance" of the jail.  Okla. Stat. tit. 51, § 155(24).  Indeed, one court found immunity pursuant to Section 155(24) when plaintiff brought a claim related to a strip search conducted during the booking process at a detention center.  *See Myers v. Leflore Cnty. Det. Ctr.*, No. CIV-07-223-FHS, 2009 WL 87599, at *7 (E.D. Okla. Jan. 12, 2009) (noting that "[defendant's] remaining claim related to the alleged strip search [conducted when defendant was booked at detention center] clearly involves the operation of the [detention center] by . . . a 'political subdivision' under the [GTCA], [and therefore] operates in favor of [the political subdivision] and bars such state law claims against it").  The Court therefore grants Walton's Motion to Dismiss as to Plaintiff's assault and battery claim.

### E.     Punitive Damages

Walton moves to dismiss Plaintiff's claim for punitive damages, arguing that: (1) the punitive damages claim asserted against him in his official capacity is barred as a matter of law; and (2) the punitive damages claim asserted against him in his individual capacity should be dismissed for the same reasons supporting dismissal of underlying individual capacity claims.  Plaintiff concedes that punitive damages are not available against Walton in his official capacity, and this portion of Walton's Motion to Dismiss is therefore granted.  Plaintiff argues, however, that because his individual capacity claims survive Walton's Motion to Dismiss, so should the punitive damages claim associated with such individual capacity claims.  Given the Court's previous holding with respect to Walton's individual capacity claims, *see supra* Section II.B., the Court agrees and denies Walton's Motion to Dismiss insofar as it seeks dismissal of Plaintiff's claim for punitive damages against Walton in his individual capacity.

## III.    Ketcher's Motion to Dismiss

Ketcher – who is sued by Plaintiff (1) in his official capacity as a Rogers County deputy sheriff, (2) in his official capacity as a Cherokee Nation marshal, and (3) in his individual capacity for actions he took as a Rogers County deputy sheriff and Cherokee Nation marshal – moves to dismiss all claims against him pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)").  Specifically, Ketcher argues that tribal sovereign immunity protects him from suit.

### A.     Rule 12(b)(1) Standard

Federal courts are courts of limited jurisdiction and may exercise jurisdiction only when specifically authorized to do so.  *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994).  "A court lacking jurisdiction must dismiss the cause at any stage of the proceeding in which it becomes

21

apparent that jurisdiction is lacking." *Scheideman v. Shawnee Cnty. Bd. of Cnty. Comm'rs*, 895 F. Supp. 279, 280 (D. Kan. 1995). The party seeking to invoke a federal court's jurisdiction sustains the burden of establishing that such jurisdiction is proper. *Winnebago Tribe of Neb. v. Kline*, 297 F. Supp. 2d 1291, 1299 (D. Kan. 2004). When federal jurisdiction is challenged, the plaintiff bears the burden of showing why the case should not be dismissed. *Id.*

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally take one of two forms. *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001). "First, a moving party may make a facial attack on the complaint's allegations as to the existence of subject matter jurisdiction." *Id.* "In reviewing a facial attack, the district court must accept the allegations in the complaint as true." *Id.* "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction is based." *Id.* "In reviewing a factual attack, a court has 'wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts.'" *Id.* (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995)). The Court construes Ketcher's Motion to Dismiss as a facial challenge on this Court's subject matter jurisdiction and will address the motion accordingly. *See Gold Bank v. Johanns*, No. 05-2239-JWL, 2005 WL 3536197, at *1 (D. Kan. Dec. 23, 2005) (construing motion to dismiss based on sovereign immunity to be facial challenge under Rule 12(b)(1)); *Jones v. U.S. Dept. of Justice*, No. Civ.A. 02-M-2056,  2003 WL 24303731, at *1 (D. Colo. Sept. 22, 2003) (same).

### B.    Claims Asserted Against Ketcher as Cherokee Nation Marshal

Indian tribal governments possess the same immunity from suit enjoyed by other sovereign powers and are "subject to suit only where Congress has authorized the suit or the tribe has waived

22

its immunity." *Kiowa Tribe of Okla. v. Mfg. Tech.*, *Inc.*, 523 U.S. 751, 754 (1998).  This immunity applies to tribal government officials acting in their official capacity.  *See Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1296 (10th Cir. 2008) ("It is clear that a plaintiff generally may not avoid the operation of tribal immunity by suing tribal officials . . . . Accordingly, a tribe's immunity generally immunizes tribal officials from claims made against them in their official capacities."); *Fletcher v. United States*, 116 F.3d 1315, 1324 (10th Cir. 1997) ("[T]ribal immunity protects tribal officials against claims in their official capacity.").  Tribal sovereign immunity does not extend, however, "to an official when the official is acting as an individual or outside the scope of those powers that have been delegated to him." *Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Okla.*, 725 F.2d 572, 576 n.1 (10th Cir. 1984); *see also Native Am. Distrib.*, 546 F.3d at 1296 (citing *Russ v. Uppah*, 972 F.2d 300, 303 (10th Cir. 1992) ("[S]tate officials may . . . be sued in their individual capacities for actions performed in the course of their official duties and are personally liable for damages awarded.")).

Based on the above law, Plaintiff concedes that the claims against Ketcher in his official capacity as a Cherokee Nation marshal should be dismissed.  (*See* Pl.'s Resp. to Ketcher's Mot. to Dismiss 3.)[7]  Plaintiff objects to dismissal of the individual capacity claims against Ketcher, however, based on the premise that "[t]ribal officers sued in their individual capacities cannot cloak

---

[7] Based on this concession, Plaintiff stated that he would "be filing separately a Motion to Dismiss . . . [Ketcher] in his capacity as a Cherokee Nation marshal[.]" (*Id.*).  Plaintiff subsequently filed the Joint Stipulation of Prejudice dismissing Cherokee Nation and Cherokee Nation Entertainment, LLC, *see supra* fn.1, but did not include Ketcher in said dismissal.  Therefore, the claims against Ketcher in his official capacity as a Cherokee Nation marshal remain ripe for disposition.

themselves in a tribe's sovereign immunity." (*Id.* 5.)  Although, as outlined above, this statement of law is generally correct, "[c]laimants may not simply describe their claims against a tribal official as in his 'individual capacity' in order to eliminate tribal immunity." *Native Am. Distrib. v. Seneca-Cayuga Tobacco, Co.*, 491 F. Supp. 2d 1056, 1071 (N.D. Okla. 2007) (citing *Bassett v. Mashantucket Pequot Museum and Research Ctr. Inc.*, 221 F. Supp. 2d 271, 280 (D. Conn. 2002)). Rather, "a tribal official, even if sued in an individual capacity, is only stripped of tribal immunity when he acts 'without any colorable claim of authority.'" *Native Am. Distrib.*, 491 F. Supp. 2d at 1071 (citing *Bassett*, 221 F. Supp. 2d at 280); *see Burrell v. Armijo*, 456 F.3d 1159, 1174 (10th Cir. 2006) (noting that exception to tribal sovereign immunity is invoked when complaint "alleges that the named officer defendants have acted outside the amount of authority that the sovereign is capable of bestowing").

Plaintiff's Second Amended Complaint does not contain any facts or allegations suggesting that the actions taken by Ketcher in his capacity as a Cherokee Nation marshal were done without colorable authority, so as to support individual liability.  In fact, the Second Amended Complaint suggests just the opposite.  (*See* Second Am. Compl. 3-4 (alleging that, as a Rogers County deputy sheriff and Cherokee Nation marshal, Ketcher had "the authority to make arrests and imprison persons under color of law for actions occurring within those jurisdictions").)  All claims against Ketcher based on actions he took as a Cherokee Nation marshal – both in his individual and official capacities – are therefore dismissed.

### C.    Claims Asserted Against Ketcher as Rogers County Deputy Sheriff

Ketcher argues that because he was acting solely as a Cherokee Nation marshal on the night he arrested Plaintiff, the claims asserted against him in his capacity as a Rogers County deputy

24

sheriff should be dismissed.  (*See* Ketcher's Reply Br. in Support of Mot. to Dismiss 4-5.)  The problem with Ketcher's argument, however, is that the Court is required, at this stage of the proceeding, to "accept the allegations in the complaint as true." *Stuart*, 271 F.3d at 1225.  Although disputed by Ketcher, Plaintiff's Second Amended Complaint clearly alleges that Ketcher was acting, in part, in his capacity as a Rogers County deputy sheriff during the events underlying Plaintiff's claims.  (*See* Second Am. Compl. 3 (alleging that "at all times relevant to the claims alleged herein, [Ketcher] was a commissioned law enforcement officer acting as a marshal for the Cherokee Nation and a deputy sheriff for the Rogers County Sheriff's Office"), 6 (alleging that Ketcher placed Plaintiff under arrest "in his capacity as a Cherokee Nation marshal and as a Rogers County deputy sheriff"), 12-14 (alleging that Ketcher, "while acting in his official capacities as an employee of (a) Sheriff Scott Walton of the Roger's County Sheriff's Office and (b) the Cherokee Nation, both as a deputy sheriff for the Rogers County Sheriff's Office and Cherokee Nation marshal" deprived Plaintiff of various constitutional rights).)  Because the Court must accept the allegations of Plaintiff's Second Amended Complaint as true, and because tribal sovereign immunity does nothing to shield Plaintiff in his capacity as a Rogers County deputy sheriff, the Court denies Ketcher's Motion to Dismiss as to the claims asserted against Ketcher in his official and individual capacities for actions he took as a Rogers County deputy sheriff.

## IV.   Conclusion

For the reasons outlined herein, Walton's Motion to Dismiss Second Amended Complaint (Doc. 58) is GRANTED IN PART and DENIED IN PART.  Specifically, the Court denies the motion as to the § 1983 claims asserted against Walton in his individual and official capacities and as to the punitive damages asserted against Walton in his individual capacity.  The Court grants the

motion as to Plaintiff's claim for punitive damages asserted against Walton in his official capacity and Plaintiff's state tort claims of false imprisonment and assault and battery.

Ketcher's Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 59) is also GRANTED IN PART and DENIED IN PART.  The Court grants the motion as to all claims asserted against Ketcher for actions he took as a Cherokee Nation marshal and denies the motion as to all claims asserted against Ketcher for actions he took as a Rogers County deputy sheriff.

ORDERED THIS 19th day of January, 2012.

TERENCE C. KERN
Senior United States District Judge